We move to the second case this morning, the state of Kevin Flynn v. Frances Gecker. The bankruptcy trustee continues to claim that the state of Kevin Flynn v. Frances Gecker intends that Kevin Flynn v. Frances Gecker's disclosure violations to the Illinois Gaming Board actually caused injury to the debtor Emerald Casino in the amount of the full value of Emerald's gaming license. In other words, the trustee says that Kevin Flynn v. Frances Gecker's nondisclosures of two pieces of information standing alone caused the IGB to revoke Emerald Casino's gaming license and that Kevin Flynn, the estate of Kevin Flynn, should now be ordered to pay $272 million. The district court explicitly considered and rejected that claim, and rightly so. Nothing in the IGB's order revoking Emerald's license or anywhere else in the record supports the notion that Kevin Flynn's actions or the actions of the other individual defendants in this case caused the revocation of the license. The IGB order does not say that Kevin Flynn's actions were the cause of its discretionary decision to revoke the license. It says nothing remotely like that. The IGB order is, of course, a regulatory decision, and it addresses whether the regulated entity, Emerald, should have its license revoked in the IGB's discretion. The IGB order finds that Emerald, the regulated entity, violated five IGB rules, and the IGB order concludes that on the totality of the evidence before it, and considering that Emerald had no revenues against which monetary fines could be assessed, based on that, revocation was appropriate. The IGB order doesn't say, nowhere says, that Kevin Flynn was the cause in fact or the legal cause of its decision. The IGB said that it was revoking the license based on the seriousness of Emerald's transgressions. But the district court found that many of the transgressions that the IGB relied upon were not proved in this case. For example, the district court found that the trustee did not prove, and the Illinois appellate court also questioned, the IGB's reliance on connections to organized crime. The district court found that the trustee could not prove that Emerald had secretly entered into an agreement with the Davis companies and Rosemont Mayor Don Stevens. The district court found that Emerald did not conceal its construction activities in Rosemont when it was building the casino there. And most fundamentally, the district court found that Kevin Flynn and the other individual defendants were not acting to deceive the IGB. They were not colluding to conceal mischievous conduct from the IGB. So the IGB's stated basis for its decision, the seriousness of Emerald's transgressions, was largely unfounded. So not only did the IGB not say that Kevin Flynn's conduct had caused it to revoke the license, but also the majority of what it did say caused it to revoke the license couldn't be proved in this case. The actions that Kevin Flynn actually took, as found by the district court here, did not cause, as a legal or factual matter, the IGB's discretionary and unprecedented decision to revoke Emerald's license. The revocation is final. You can't challenge it. That's correct. Why do you think, what are the grounds for it? What are the grounds for the revocation? Yeah. I think the grounds are those stated in the IGB's order. The IGB perceived in a decision that's since been questioned by both the appellate court and the district court in this case, it perceived that the officers of Emerald had entered into a secret agreement with Davis Companies, with Duchossois, with Mayor Stevens, to carve up Emerald after they won approval of moving the casino to Rosemont. That was a major basis for the IGB's decision. When it came time to decide this case, to decide the trustee's contract claim against Kevin Flynn, the trustee had to prove that Kevin Flynn actually engaged in that conduct, which the IGB cited. And the trustee couldn't do that. The district court found that the trustee could not prove that there was any such secret agreement. So that's one ground for the revocation. Another ground that the IGB pointed to was the concealment of construction activities. The district court looked at that in great detail and found that they were not concealed. They were public. IGB employees visited the construction site. So the district court, which had to accept these things for itself, I mean, a trial needed to be held in this case because the IGB proceeding was not, of course, a contract claim. It was not a civil proceeding assessing whether individual people had breached their contract with Emerald and thereby caused injury to Emerald. It was a regulatory decision. It was a regulatory action assessing whether Emerald, the entity, had complied with regulations. The trustee's theory of how the IGB order can be read to support causation, how the IGB order supposedly can be read to support this claim that each individual defendant independently caused the revocation, she focuses on language in the IGB order that each of the five counts alone supports revocation. The IGB order relies on five counts, each of which finds that Emerald violated five different IGB rules. And at the end of each of those counts, the IGB says, this count alone supports revocation. That language cannot bear the weight that the trustee puts on it, and there are several reasons why. At the first, highest level, what the words on the page say is that each count alone supports revocation. Now, I read those words to mean that each count alone would be sufficient to permit revocation within the IGB's statutory authority. I don't believe those words say that each count alone impelled the IGB to revoke the license. In other words, the IGB is not saying that if this were the only count in front of us, we still would revoke the license. It's saying this count alone would be sufficient to permit us to revoke the license. The trustee disagrees with me on that. But that's just one problem with her argument. It's a discretionary decision committed to the judgment of the regulatory authority. That's true. So in no situation would the IGB be impelled to revoke a license. So I'm not sure that your interpretation of that language holds up. By impelled, I mean caused, not compelled. I mean, the IGB didn't say that this count alone is driving our decision to revoke the license. I agree with you 100%. And it doesn't really matter because the district court found numerous contract breaches by your client and others? Oh, it definitely matters. The trustee believes that that language alone supports revocation is enough to strip out the individual actions that the defendants engaged in as found by the district court. Now, if you look at the counts of the complaint, and I would point you to pages 27 and 28 of our brief, which lists them all out, the counts of the complaint each rely on several categories of conduct that the IGB found that Emerald engaged in. So just look at count five, for example. Count five cites 11 categories of conduct that Emerald engaged in, and the IGB's understanding of that conduct or its perception of that conduct caused it to say, in these 11 ways, Emerald violated rule 110, IGB rule 110. The trustee believes that because the IGB said this count, this count five, alone supports revocation, any violation by any individual of rule 110 is enough to say that each individual caused the revocation of the license. Let me point this out with the example of Kevin Larson. Kevin Larson was the president of Emerald. The district court found that he engaged in one action that violated rule 110, which was to respond to a question from the IGB about what role Kevin Flynn had at Emerald before June 1999. Kevin Larson said he had no role. The district court and the IGB both disagreed with that as a factual matter. So looking at count five, there are 11 categories of conduct. One of those categories is not disclosing Kevin Flynn's role at Emerald, or concealing Kevin Flynn's role at Emerald before June 1999. If the trustee's theory is correct, if the trustee is right to believe that when the IGB said this count alone supports revocation, if she's right that that language means that every single individual violating an act of every single defendant independently caused revocation of the license, then we have to understand that language to mean that each of the 11 separate categories under rule 110 caused revocation of the license. Here's why that is. The order is set up with five counts. The 11 categories under rule 110 are actions that the IGB found Emerald to have taken. Altogether, altogether, that makes up count five, which the IGB said was sufficient to revoke the license. The IGB did not say each one of these 11 categories was alone sufficient to revoke the license. So to take the alone supports revocation language and use that to establish causation against an individual defendant, the trustee needs to show that what the IGB meant was that every single category was enough. The district court said nine out of 11 of these categories have not been proved in this case of count five. So a tiny piece of count five remains. That can support revocation on the trustee's theory only if each individual category was enough, and the IGB order clearly does not say that. But there's another problem with the trustee's argument. This is an action against individual defendants. The counts of the IGB order discuss actions by Emerald, so that action about not disclosing and concealing Kevin Flynn's relationship with Emerald before June 1999, according to the district court, that was an action engaged in by four separate defendants. So to accept the trustee's theory that every single defendant's breach independently caused revocation of the license, you would need to find, or the district court would have needed to find, that the IGB thought one statement by Kevin Larson alone would have set the IGB down this path of investigating Emerald and revoking the license. The district court did not find that, and in fact expressly disclaimed that. So the IGB, the trustee's reliance on this alone supports revocation license as the entire causation case just falls away. That's far too slender a read to support the weight that she puts on it. Another problem here is legal cause. This agreement, just bear in mind, the trustee advanced two primary claims against the defendants. One was a breach of fiduciary duty claim based on their actions as officers and defendants of Emerald, and the other was a contract claim based on their agreement in this shareholder's agreement to comply with the rules and orders of the IGB. This agreement, just to make sure you're aware, was the same shareholder's agreement that all shareholders signed, not just the defendants in this case, not just the officers and directors. So if the trustee's reading of this contract is right, every shareholder who signed this accepted responsibility for the full value of IGB's license, I'm sorry, Emerald's license, in the event that the IGB engaged in a stunning, unprecedented exercise of discretion. And in this case, the trustee's theory is that every shareholder agreed to guarantee the full value of the license in the event that the IGB engaged in a stunning and unprecedented act of discretion based on events that didn't actually happen. That's a reasonable interpretation of what District Judge did, since the individual defendants were all directly responsible for Emerald's compliance, right? They were all involved in Emerald's compliance. All but one.  Mr. Peterson also did have to respond to questions from the IGB. He was held not liable, that's correct. Other shareholders had to submit personal disclosure forms to the IGB. So other shareholders also were involved in compliance in the sense of being required to submit personal disclosure forms to the IGB. What was the purpose of the shareholder agreement? It sets out obligations. It talks about restrictions on the ability to sell shares. What's the purpose of this provision, the provision that says we'll comply with IGB rules? As it says, it's an agreement by the shareholders to comply with IGB rules. What it doesn't say, what is not its purpose, is to guarantee the value of the license. Now I believe that the contract is- Somebody, an individual can take actions that would cause revocation. So you're making the promise you won't do that. Somebody must have thought that promise was a good idea and had some meaning. And would have consequences if there was a violation. It is recognized that revocation was within the IGB statutory authority for any violation. But the contract does not say because of the IGB's broad discretion to revoke the license based on any violation, I hereby guarantee the value of the license. It doesn't need to say that in order for there to be foreseeability that license revocation is a consequence or at least a potential consequence of violations. This contract clause commits the shareholders to fully comply with IGB rules so as not to jeopardize the license. You are correct. I certainly agree that revocation is a potential result of any violation. Right, and in that sense it meets the foreseeability test. Easily meets the foreseeability test of approximate causation, legal cause. Your Honor, I respectfully disagree. When there is a connection between event A and event B, and in between those two events there is an independent discretionary action. This is not Paul's graph. This is not the remote explosion that causes an injury somewhere well down the line. This is the foreseeable consequence of a failure to comply with IGB rules is the loss of the license. The fact that the IGB never revoked a license before doesn't matter for legal cause. It's a very light touch test. For one thing, this is a contract case rather than a tort case. And the contract indicates that they did foresee this possibility and promised that they would prevent it from happening. I don't know of any other way to read that promise. The concepts are the same. It's a legal causation requirement. Fair enough. In this case, just to keep in mind the actions that Kevin Flynn, my client, actually took, here's what he did. He did not disclose his connection with his company Field Street, the Field Street Agreement, and he did not disclose his employment, his role at Emerald before June 1999. However, he had disclosed that he was involved with Emerald as a potential shareholder much earlier, from 1996. So the question is whether those two actions could have caused the IGB to take this dramatic step. The district court held they were factors in the IGB's decision, substantial factors. In fact, the district court held that they caused one-sixth the value of the license. To respond to your Honor's point about foreseeability, I don't believe this is a foreseeable result of the actions that Kevin Flynn took. But putting that to one side, there's no evidence in the record that the actions that Kevin Flynn took could be factually, causally linked to one-sixth the value of the license. And actually, the trustee agrees with us on that. That's a measure of damages question. That's not a causation question. The measure of damages that were actually caused by the conduct is the whole central question here. No, causation is linked to the injury, which is the loss of the license. So it's revoked or not. Right, exactly. And then once that causation is established as a factual matter, and there's legal cause, foreseeability, then the measure of damages is a separate question. The one-sixth question? Right, that's a separate question about whether it's a joint and several injury or just a several injury. The measure of damages question is completely separate from the causation question. Okay. Two responses. First of all, raising the several and joint and several liability, this is clearly a several liability case. The parties individually promised their performance, and the district court correctly ruled on that point. As to whether the one-sixth damages point is relevant to causation, the trustee needed to prove that the damages awarded were resulted from the actual actions of the defendants, the individual defendants. The damages awarded were one-sixth the value of the license. No. Maybe you're not grasping my point. The trustee did not need to prove that. The trustee needed to prove what the measure of damages, needed to prove damages. And there was a question about how to measure the damages. What was the value of the license? Fair enough. That's an entirely separate question factually from the substantial factor factual causation question and the legal causation question. The district court did need to find, and it did find, that the individual defendants caused one-sixth of the harm. Putting aside the measure of damages, I agree with you, the $272 million question is a separate question. The district court concluded that it did need to find that. Okay. Well, that may have been wrong as a legal matter, but we're not here relitigating that. Okay. There is no obligation to prove that each defendant proved one-sixth, or each defendant caused one-sixth of the damage. There's a requirement of substantial factor causation after but-for causation is established. I understand you not to be contesting but-for causation, so it's just a substantial factor causation question because we've got multiple actors here, and then there's a legal causation question, and once those hurdles are gotten over, then it's a measure of damages question, whether the judge was right to slice and dice it as she did. Substantial factor causation was not proved here. The decision to revoke was based on a host of factors, many of which were not proved in this case, and nearly all of which had no connection to Kevin Flynn, and I see that I'm into my rebuttal time. Mr. Young? Good morning. May it please the Court. John McMahon did not cause the loss of Emerald Casino's license. Who did? Your Honor, I think that's not an issue we take a position on. That's very interesting. It would be very difficult for us to decide this case without taking a position on that question. Well, Your Honor, I think the IGB determined that the organization failed to comply with certain Illinois Gaming Board Mistakes were made. Passive voice, right? Is that what the position is among the defendants? Your Honor, my client's position is that he did not have sufficient involvement in the transactions at issue in this case. Right. We've just been told that neither did Mr. Flynn, and I assume we get the same positions from the other folks. Your Honor, I'm not speaking for anybody other than Mr. McMahon, and Mr. McMahon is mentioned from a liability perspective at only one point in the district court's opinion, and the basis for him being subjected to $45 million worth of personal liability is the failure to disclose these agreements to the IGB. If you look at the specific references in the district court opinion, his involvement really comes down to his attendance at a single meeting on September 30th of 1999. Now, there were disclosures made of agreements prior to that meeting, and I'm speaking about the Director of Compliance's renewal application that disclosed agreements, and I'm also speaking about subsequent correspondence between the General Counsel and the Illinois Gaming Board regarding the disclosure of agreements. Finally, Your Honor, in 2000, when the subject agreements are ultimately produced to the board, it's the General Counsel and the Director of Compliance who are not only producing them but apologizing for the omission. My client is being held liable solely on the basis of that meeting, and we believe that the minutes of that meeting, which are in the record, coupled by the correspondence and contact between the General Counsel and the Director of Compliance with the Gaming Board, both before and after, really establish that there's not a sufficient basis to find legal causation or factual causation. Let's look at this for a moment from the perspective of the IGB, right, where at least one gets the impression from the district court's findings that getting a straight answer out of Emerald Casino's management was like pulling teeth. Your Honor, I think I have to concede the record reflects frustration and back-and-forth and I think some degree of irritation on the part of the Gaming Board that those agreements weren't produced. I don't deny that. What I do argue before you today is that my client wasn't the General Counsel. He wasn't the Director of Compliance. The meeting for which he's being held personally liable was a meeting where he showed up to talk about financing matters. He was there with a banker from Jeffries talking about how the organization was going to raise money, and the minutes reflect that. So if he is to be held liable under the provision of the shareholder agreement you're talking about, it needs to be based upon his conduct. And but-for causation can't be present, we believe, given the long chain of communication after that meeting with the General Counsel. So you think we should modify the judgment so that the other five are liable for $54 million each? I think on behalf of our client, we believe the judgment should be reversed as to him for lack of causation. And what happens to that $45 million worth of the damages? Well, I believe that- We'd have to answer that question, right? I'm sorry? We would have to answer that question. If you reverse as to my client, affirm as to everybody else, and leave the same damages in place, yes, you would. Thank you. Thank you. Thank you, Counsel. May it please the Court. In response to Judge Hamilton's question as to who was responsible for the loss of Emerald's license, it was each of the defendants, including Pierre Peterson. The Illinois Gaming Board issued a lengthy final order after a very lengthy hearing in which it said in its operative provisions, the ordering provisions of that order, that Emerald, which is a corporation, acting through its officers, directors, employees, and key persons, the defendants were the officers, directors, agents, employees, key persons of Emerald who committed the misconduct. Although defendants do not appeal the finding that they breached the Emerald amended shareholders agreement, they spend a substantial amount of time trying to downplay their misconduct. They say, for example, in their briefs, and they said again today, Kevin Flynn committed two minor disclosure violations. No one can read the Illinois Gaming Board order and come away with a conclusion that the Illinois Gaming Board revoked this license because of a minor disclosure violation. In fact, that order says Kevin Flynn flat out lied. And what did he lie about? He lied about his role at Emerald. Judge Pallmeyer said he was not telling the truth. That is her language to the IGB in connection with his role at Emerald. He was lying about what he was doing for the entity that was being regulated in a very strictly regulated industry. Understandably, gaming is controversial and all the rest of it, and it's a very strictly and tightly controlled industry, and defendants all knew that. And they lied to the IGB, each of them. Kevin Larson, Joe McQuaid, Kevin Flynn, Don Flynn, they all lied about what Kevin Flynn's role was. How many directors were there for Emerald? There were at various points in time, it varied, but during the key time of 1999, there were five directors. And all were involved? We did not sue Eugene Haytow. We did not sue him. He differs from the other directors in that Mr. Peterson was very involved in the rule violations. He was asked questions about Kevin Flynn's role at Emerald. Mr. Haytow was not asked any of that. He didn't make any of the lies or misrepresentations, and we elected not to pursue him. We did pursue all of the other directors. And so what you have is you have an individual who lied about what he was doing for the regulated entity. Others backed him up in that lie. The district court found that that violation of Rule 110 and 140 was very important because it was important to the IGB to know who was managing casinos. That's a key thing they need to know to regulate that industry. He also lied about Field Street. This isn't a company he forgot about. This is a company he formed literally a week to 10 days before he filled out his disclosure form. It was a company in which he had entered, he placed a contract there, in which he had agreed to engage in anti-competitive behavior, to serve as an anti-gambling front, to try to keep Native American casinos out of southwest Michigan. He agreed to receive half a million dollars a year for doing that, plus a $5 million bonus if he succeeded in keeping Native Americans out for five years. Most people don't forget an agreement under which they're going to make half a million dollars. He didn't put it on his form, and as the district court found in her ruling, he did not tell the truth to the IGB when they found out about it from the Indiana regulators, and he was asked by the agent who was asking questions about it, when did you form this? He said he formed it in 2000 so his disclosure would look timely of it, as opposed to when he actually formed it in 1999 when he didn't put it on his forms. So we have serious lies here. With respect to Mr. McMahon, one of the issues that troubled the IGB was the status of construction, and the district court, we think mistakenly, but it doesn't matter because there are many breaches of the contract, the district court mistakenly thought that that meant they didn't know something was happening at the site. But you have to put it in context. That September 30th meeting that John McMahon attended is key,  and at that meeting, Mr. McMahon is asked, what's the status with Rosemont? What is going on? He says we have no agreements with Rosemont. In point of fact, they have a letter of intent that lays out all the terms of the lease that Rosemont's attorney said agreed to all key terms, the rent, the time of the lease, all the things that would have to happen. Only thing left to do was to put it in a document with boilerplate. They had extended that letter of intent, and they had negotiated an agreement so they could go on the site. They tell the IGB, we have no lease for that site. We don't have that agreement. They ask, what's happening? Mr. McMahon says, there's some clearing activities going on out there, but it's all under Rosemont's expense, implying that Rosemont is doing something out there. But in point of fact, Emerald, by that point in time, has already spent several hundred thousand dollars on construction work. They are told, turn over all contracts. They don't turn over any of these Rosemont agreements. They don't turn over their agreements with a variety of construction professionals. Mr. McMahon testified he was the point person on construction. He was the CFO of this company. He was then told by Sergio Acosta, the administrator, be over-inclusive, give us all your contracts. They have a discussion about what they want, and he says, give us everything and we'll let you know if we don't need it. And the IGB asks repeatedly, from September through January, do you have anything yet? The judge lays all of that out in her opinion, and they never produce anything. And she finds that that's a violation of Rule 140 and it's a serious violation. Right, because it entails active concealment as opposed to just negligent nondisclosure. That's right. The things that weren't disclosed here were not things in the past that someone forgot. They are things that were going on right then and there, that they were making a decision for whatever reasons they had, and the judge did not describe motives to it, although one could look at the litigation that was pending against them and come to some conclusions about what their motivations might have been. The district court didn't make findings on that. But she concluded that they committed serious rule violations. And while they talk about what the trustee is asking you to do with regard to causation, in fact, the district court found that they were the cause in fact and the legal cause of the loss of Emerald's license. She made a finding of that, even though she found not that conduct didn't occur, but that she wouldn't have found it to be a rule violation. And while we disagree that the district court had the authority to do that, for example, she takes all the letters that were sent about the shareholders that the IGB found not to be in compliance with the disclosure rules. She says, well, I think they're good enough because the IGB might have been able to figure it out. She doesn't say it didn't happen. She lays out in great detail. She doesn't say that they didn't meet with Davis and Duchossois and have all the conversations and that stock didn't somehow end up in the hands of 12 individuals with connections to Mayor Stevens. She finds all that. She just says, I'm not certain they actually really made a contract at that time. She finds all of the facts. And on the organized crime issue that counsel raises, that truly is a red herring. The Illinois Gaming Board did find that they had associated with individuals connected with organized crime or of a bad character. They, meaning who? They, meaning the Emerald defendants, that they had agreed, that Flynn had agreed to sell stock to those individuals. Those individuals are part of the group of 12. And the Illinois Appellate Court reversed. Not because the targeted individuals weren't potentially connected with organized crime, but because it concluded that proving that violation with confidential FBI memoranda didn't satisfy the test of the statute. You had to show what their public reputation was. And so that was withdrawn. But what's key about that is that the Illinois Appellate Court still affirmed the revocation. If, as counsel says, this is all about organized crime, and that was what the IGB was saying in its order, the Illinois Appellate Court would have had to remand because they would have had to ask the regulatory body, will you still revoke in light of the fact that we don't find this violation was proved? And they didn't do that. They accepted the Illinois Gaming Board at its word when it said in the operative provisions of its order that each violation alone supports revocation of the license. That it meant what it said, that it wasn't saying maybe sort of in the totality of the circumstances, because they could have said that. They could have said these combined circumstances lead to revocation. Instead, they said each violation of Rule 140 causes it, each violation of Rule 235 causes it, each violation of Rule 110 causes it. So they ruled based on each single violation, finding each to be serious. And so therefore, the district court's finding that this was a cause in fact is not clear error. It's not illogical or improbable. There's no other reason why Emerald lost its license but for the rule violations of these individuals. With respect... Steve, could I ask you to just sketch for us the practical stakes here? You've settled with two of the individual defendants, is that right? Correct. That's right, Your Honor. Okay. In terms of what's left, what are we looking at in terms of overall liabilities of Emerald Casino minus other assets other than the proceeds in this lawsuit? And what do you expect on this question, in particular, joint and several liability? What are you expecting in terms of ability to collect? If I understand Your Honor's question correctly, the claims in the estate, as we stand right now with the settlements, will not even come... I mean, the trustee is not even at the point where she'll be making the distribution to the unsecured creditors as a result of the settlements. Because of the administrative claims that they ran off, there's large amounts owed to the attorneys who represented Emerald during the Chapter 11 case. There's amounts owed on various other things. And so the trustee needs to collect the $272 million to be able to make creditors' home perhaps even a little bit more than that. So none of the settlement, whatever is involved in the settlement, goes against the $272 million? Well, it does in the sense that if Your Honors were to say that $272 million is... Well, given that it's... Right, that that's the number, then yes, we would. And they're jointly and severally liable. The amounts we collected from Donald Flynn and Walter Hanley would reduce those amounts. And then the balance would be what we would collect. We would agree with that. We don't think that we can collect $272 million six times over. We just think each should be held responsible because certain of the defendants will not pay us a dime and never will be able to pay us a dime. Others can pay more than the $45 million. Okay, so who, how much, what do you expect? Do you want to know what we've settled for? No, no, no. If it's confidential, I don't need to know. I assume you had to tell the bank, actually, Gordon. We did, we did. I'd like to know. Donald Flynn paid the judgment in full. Walter Hanley paid $7 million. Okay, and what do you expect from the other four in terms of available assets? Kevin Flynn takes the position, Kevin Flynn's estate takes the position, notwithstanding that it would have the money to pay $45 million, that all of his assets are protected, that everything he did was in a spendthrift trust. And so we will be in litigation in the district court over the validity of that spendthrift trust because everything he's done is apparently in a spendthrift trust. Okay, the other three defendants take the position that they cannot afford to make any payments under the judgment, and we have done some investigative work about that, and they probably are correct that we won't collect from McMahon, McQuaid, or Larson. You know, we may be able to garnish their wages if the trustee chooses to do something like that for those that are still employed. But those three individuals have indemnifications from the Flynn's. The Flynn's paid their legal fees and were to indemnify them on the judgment, although they now contend... But the liability here wasn't joint and civil, was it? No, the court entered several judgments against each of them for $45 million, and we would contend that that is an error. And the reason why we think it is an error is the purpose of Illinois contract damages are to put the injured party in the position they would have been in had the contract been performed. Each of these individuals breached the contractual provision saying, I will not violate IGB rules. And as a result of each violation, the Illinois Gaming Board said the license is revoked. So we would contend each owes $272 million. If you accept defendants' argument that it is too confusing to figure out how you parse that up, that we have to parse out what percentage of the license was taken away by virtue of Kevin Flynn's lies as opposed to Joe McQuaid's lies as opposed to Kevin Larson's lies, something you'd never see in the decision because the license is indivisible, and we can't call the IGB board members to the stand, you can't call judicial and quasi-judicial officers to the stand to rate their opinions and what they thought was more important. You take it at its word. Then we think the district court judge should have applied the theory of concurrent breach. There is an Illinois appellate court decision, the Insure One case, which imposes that doctrine under Illinois law. It doesn't come up very often because it's an unusual circumstance where you have an independent contract but multiple parties all breaching the exact same provision and the damage being an indivisible thing. But that's what that rule is designed to cover. Their alternative, just let the wrongdoers off the hook because of an impossible burden of proof. Well, let's not look at the defendant's position but at the district court's position, which took a very careful look at Insure One. As I understand Restatement 2nd, Section 289, this question about joint and several versus several liability looks a lot like a question of intent and starts to feel very much like a factual question that the district court looked at carefully and came up with a reasonable solution for a mess. Tell me what's wrong with that. We think it's wrong because we believe that she was required to follow Insure One. I don't understand your argument on that. It's an intermediate appellate opinion. I understand it may have persuasive value for predicting Illinois law, but neither the district judge nor we are required to follow that. No, but the presumption is under the West decision, the Supreme Court case going back many years, that because we don't want to have two bodies of law, one in the federal courts and one in the state, that if you have an intermediate state appellate decision, no conflicting decisions because there are no conflicting decisions. We checked again yesterday to see if anything had been citing that case and nothing cites it for the concurrent breach issue. If you have no conflict and you have the Illinois Supreme Court declining review, then the presumption is you will follow that case unless there are strong persuasive legal reasons not to do so. And we would submit that the district court acknowledged that in the area of tort liability, this court's case, the Sheehan case, where all the officers jumped on an individual and caused his death and you couldn't tell which person's jumping on him caused it, that when you have a unique circumstance like that, the courts do find all are liable if each... But here's where the separation of tort and contract becomes important because the contract rule is different. There has to be a joint obligation for there to be joint liability under contract law. But what you have here, what the concurrent breach doctrine does is it recognizes that even if you have single liabilities because each of you is breaching the same provision, that's what Restatement 2289 does as well. It says each of you have a separate obligation. You've each caused the same harm to the non-breaching party and therefore we're going to make you each responsible for the full measure of the contract damages. And that's also consistent, I think, with a fundamental rule that if you accept their view that we had to somehow prove an exact percentage of loss of a license, they've created an impossible burden of proof. Whereas I think the law says that if you've breached a contract, the court isn't supposed to establish a burden of proof on damages that is impossible for you to meet. Right, again, that's a measure of damages question. But the key damages issue here is, number one, whether 272 is the right amount, and number two, whether the obligation is joint in several or just several. And that's just a contract issue. You have to add in... I still haven't understood what the settlement did to the total liability. Well, right now the settlements did nothing because each defendant was liable for $45.3 million. So Don Flynn paid his judgment, and that doesn't impact Kevin Flynn or any of the other defendants because he paid his judgment and his judgment was unique to him. Unless we said it's joint in several. If you say it's joint in several and the number is 272, then we would say that we would acknowledge that the $45 million would be deducted from that, as would Walter Hanley's $7 million, and they would have a credit for that. They don't get a credit today as the circumstances currently exist. One other point that we would like to make, where we do think that the district court made a legal error that does need to be corrected, is with regard to defendant Peterson. The district court basically said, I don't think, notwithstanding that the IGB said each Rule 235 violation alone supports revocation of license, she didn't think that those were violations that caused the IGB to revoke the license. And her reason for doing that was to go outside of the four corners of the IGB final order and to look at other evidence and to conclude that she thinks the IGB really would have settled those if they were standing on their own. And we think that that is an error of law. She has to accept what they said is written. We couldn't call the IGB officers to the stand to talk about what they thought about the Rule 235 violation. Their decision clearly says they think they are important. And in terms of what she looked at outside of the record, we would submit that it doesn't support what the district court... Is that the staff report? The staff report. And that staff report, Defendant's Exhibit 678, what it talks about as being something they're not addressing and that they don't need to address is the failure to disclose the purchase of shares by Donald Flynn from Pierre Peterson. That's different from the rule violation she found. The rule violation she found involved the five insiders where he arranged that sale. With regard to that, there is a staff report that comes in September of 2000. It's DX662. And it states that Mr. Flynn acquired the shares of five other original investors last year. These purchase agreements were not submitted to the board for approval as required by Rule 300235. Further investigation is necessary to determine why these transactions were undertaken without board approval. So in their own investigative memos, if we're going to look at investigative memos to determine what a ruling says, which we would submit in and of itself is improper, but if you're going to do it, those memos show that they did think that that was an issue that needed to be investigated, and they obviously thought it was important because after both of those memos are issued, the disciplinary complaint, Paragraph 41, charges that these five individuals transferred stock in violation of Rule 235. The courts focused on the IGB's settlements under Rule 224. There's a rule that the IGB has under Rule 224 that says every corporate license holder must have a procedure so that its shareholders can sell their stock. Many times license holders are not public corporations. They want to make certain if they want someone out as a shareholder, there's a means for them to get their stock sold. That provision does not say it excuses all violations of Rule 235. It does not change Section 5 of the Act, which makes revocation a penalty for violations of Rule 235. It doesn't do any of those things. It just says you have to have a procedure in case we order it. The settlement that she focuses on, the settlement involving Empress Casino, that occurred in June of 2000, and it kind of also goes to defendants' foreseeability argument. In June of 2000, as the IGB minutes show, Plaintiffs' Exhibit 858, and it's the June 30, 2000 meeting, they vote not to renew the license for the Empress Casino. The Illinois Gaming Board takes the position that the violations and conduct that they felt made Mr. Binion an ineligible owner, he owned 98% of the casino, was a reason not to renew the license. It demonstrates, shows, puts everybody on notice that rule violations are a basis to lose your license, that they do take that seriously. They ultimately settle with Mr. Binion, and they say, okay, you can sell your 98% under very strict terms, under which he only gets his money back and doesn't get the profit from the whole circumstance. He didn't violate Rule 235, so it wasn't a settlement of Rule 235. It's the same settlement they made with the Flims in Emerald that they didn't comply with and got blown up and ended in the IGB proceedings. So that whole situation with Mr. Binion isn't proof that they always settle Rule 235 violations. It has nothing to do with Rule 235. The other thing I would state is the court, the district court makes the statement that the court thought it was the totality of the circumstances, but if it's the totality of the circumstances, then Mr. Peterson's Rule 235 violation would fit within that. The other point where we think that the district court made an error was in the statute of limitations ruling. She accepted that adverse domination is set forth in the Lonnie decision controls in Illinois. This court has also found that in the Stewart's decision as being what Illinois courts would apply, and under Illinois' version of the adverse domination doctrine, it is the majority domination theory. So in other words, once the trustee proved that the majority of the board was controlled by people who would be defendants in the lawsuit, then the presumption is that their knowledge is not going to be imputed to the corporation, and the corporation can't know of the harm that's befallen it in trying to sue, even if there's an innocent director. That presumption can be rebutted only with someone showing someone had knowledge and the ability and motivation to sue, and the court says that the ability to sue is what's most important here, because we're imputing knowledge back to the corporation that's going to bar its rights. And the innocent director in Lonnie was not sufficient to rebut the presumption. The district court held, in what was a legal ruling, because the statute of limitations issue was never tried, because Judge Weedoff, when the matter was tried in front of him, he had disposed of that statute of limitations before trial. She said the creditors' committee rebuts that. If an innocent director who has a fiduciary obligation as a director and who could go to court and try to force his fellow board members to do something isn't sufficient to rebut the presumption, then a creditors' committee, which consists of creditors who are adverse to the debtor, who owe no fiduciary obligations to Emerald the corporation itself, should not their mere existence and the ability to ask the bankruptcy court for permission to sue be sufficient to rebut the presumption. In addition, we would contend that the district court slipped the burdens by saying it's not clear to me what the bankruptcy judge would have done had someone asked him could we bring the suit. We do know what Judge Weedoff said. He said it was a dubious proposition that he would have allowed that. And if we look at what happened in the critical time period during which the statute needed to be told, it seems inconceivable a court would have allowed a lawsuit, and they certainly didn't prove that that would have occurred. The committee gets appointed on November 1st of 2000. On that date, Emerald is a party to a conditional settlement agreement that's going to allow for the sale of the license. We only need to toll to December 19th of 2003 because we filed suit on December 19th of 2008, and it's a five-year limitations period. We know the statute is told through the appointment of the committee because through that date, either a majority or in the last several months, complete domination of the board is by the defendants in this lawsuit. So we need 12 1⁄2 months of tolling. In June, Emerald goes into bankruptcy court... Wait a minute. Sorry, sorry. November 1st of 2000? 2002. Okay, sorry. I misspoke. So November 1st of 2002. In the summer of 2003, end of June, beginning of July, Emerald files a motion to be able to hire and put in place bid procedures to find someone for this auction that's required under the settlement. The bankruptcy judge, Weedoff, he approves that. They go through the marketing process all through the summer and into the winter. December 15th, four days. We only have to get four more days to have the statute tolled and our suit timely. On December 15th of 2003, the IGB board says, Yes, we will go forward with the auction as indicated in the settlement agreement, and if the process continues and Emerald continues to comply with the settlement agreement, we will go forward and we will sell the license. That date passes. They hold the auction on March 10th. It's not until May 11th of 2004 that the settlement blows up and the state of Illinois elects to exercise their rights under the conditions and find that they didn't honor the terms and not go forward with it. And this timeline goes to the creditors' committees, not its ability to sue, but its motivation to sue? It goes to both. They wouldn't have any reason. I don't think they have a motivation to sue because they have no duty to Emerald, and the cases that talk about motivation talk about whether you have a legal duty to act for the entity. But I also think it goes toward proof of the defendants had to prove that there would have been an ability to sue at some point between November 1st of 2002 and December 19th of 2003. And during that time period, Emerald's a party to a settlement agreement that is going to result in the license being sold, the creditors being paid, and a lot of money going to the state of Illinois, and the Flynn's being allowed to get the money that they put into Emerald back out of the company. As a practical matter, what does this get you? Because you can't get double recovery for the value of the license. Is there a separate measure of damages for a fiduciary breach? There would be joint and several liability. Okay, so it's just another way to get... That's correct, Your Honor. Joint and several liability. Is there also a dischargeability issue? That very well may be as well, Your Honor, because if any of the individuals file for bankruptcy... And what about punitives? Can you get punitives under Illinois law for a fiduciary breach? We believe we can. We did ask for those in front of Judge Weedoff, but then with the withdrawal of the reference and everything that happened, he had said he was going to hold a hearing on punitives after he determined liability and other damages. But all his things have gone away, right? Well, he never got to rule. Stern came down, and the district court decided she would just take everything. We had completely tried the case. We had completely briefed it post-trial. Everything was done. The defendants asked that the reference be withdrawn. Judge Pallmeyer did that because of all of the confusion with Stern, and they then were allowed to represent whatever they wanted to about their defense, rebrief everything, and then we got the ruling from Judge Pallmeyer. So we never had... We had individual rulings on different issues, but with regard to that punitive damage issue, he was going to do it after he ruled on the merits. We never got to it with Judge Pallmeyer because she found the breach of fiduciary duty claim time barred. The only other point that I would make with regard to foreseeability is... Our position is that for legal causation, the purpose of this contract in response to your question, Judge Hamilton, clearly is to protect the license. If you look at the two sentences that are found in that paragraph, everything that the individuals agreed to do is to protect the license. And they were in control of Emerald. They wrote the contract. Mr. Peterson oversaw his partner writing the contract. His partner, Mr. Brett, Thomas Brett, testified, and the district court credited this, that the reason this was included was because the IGB regulated Emerald, strictly regulated it, and if any shareholder caused problems with the IGB, it could be the end of Emerald and loss of its license. So it was put in there by defendants to protect themselves from actions by other shareholders and to have other shareholders protected by actions from them. And if they wanted to limit their liability in some way, they could have put a dollar limit on it, they could have done any host of different things if they didn't really want to protect against the full panoply of punishments that the Illinois Gaming Board could impose. And so we think there clearly was legal causation. Unless the court has any other questions. Thanks. Could you just briefly address... The calculation of damages is $272 million. Looks like a, I'll just say, practical solution to a very, very complex case. A problem. You've got an argument for $615 million, for $307, for $4 something, given the various bids at various times. Is there anything else you want to add about that subject? Well, Your Honor, I think the district court took the number that she saw no defendant made a challenge to. And she says that in her decision. No defendant has challenged the $272 million sale. They challenged every other piece of the evidence. And with varying degrees, the district court agreed or didn't agree with what their challenges were. But she picked the one number that they didn't complain about. And we think that number's too low, particularly given the date of the breach. Although it relates back. And what she says is, I'm finding that to be the value on January 30th of 2001. The date of the breach that she concluded was the date of the breach. That's the value. She gets there by saying there was this actual sale for that number. And there was also actual sales of the stock for $307.5 million. And there was also an expert appraisal that they put together in a case where they were fighting to keep all of the value of the license, where they said the range was between 268 and 310. So this number fits within these numbers, and I'm going to pick it because it's also an actual sale number. We think it would have been better to take the unconditional offer that would have closed in June of $615 million plus repayment of all of Emerald's debts, what was really worth about $715 million. Because the only reason that didn't close was because of defendant's misconduct. Whatever they thought about Rosemont, they had to approve Rosemont under the legislation but for defendant's rule violations, and that's clear from decisions of the Illinois Appellate Court and the Illinois Supreme Court. And so we think that would have been the more appropriate valuation. It doesn't seem like a clear error, though. It can't be clear error if the number is too low, and that's our position with regard to their challenge. It can't be clear error if we didn't get all that we think we should have gotten and which evidence would have supported. Thank you, counsel. Thank you, Your Honor. Good morning. Good morning. May it please the Court. Peter Lowe on behalf of the estate of Pierre Peterson. The district court found after an extensive review of a very large record that Pierre Peterson had done nothing which caused Emerald to lose its license. The court below thus entered judgment for Pierre Peterson. We submit that the district court's determination on this point was eminently reasonable and should be. Let's make it clear. Pierre Peterson had a very limited role in Emerald. Pierre Peterson was not an officer of Emerald at this time. He was not an employee of Emerald. He had no role in the renewal or obtaining of the license. He was not responsible for any of these activities. He was an outside director of the company, and he owned no more than 3.5% of the shares of Emerald. He was a very minority shareholder and an outside director. He had no role in the license renewal process. Therefore, it is not surprising that Peterson was not a party to the IGP proceedings, nor, in fact, was he called as a witness in those proceedings by either the IGP or Emerald. In the 37-page final board order that revoked the license, Peterson is not named one time. There is no mention of him at all. Now, Ms. Diggie argues that, well, there's some language about the officers, employees, directors, key people. However, it's clear that that does not mean Peterson. As she herself says, there's a director they didn't even sue. She bleeds out the fact that he was represented by her law partner, but okay, there was a director they didn't sue. They didn't sue the employees who were the secretaries. There's nothing in the IGP order that says that Pierre Peterson did anything. There's nothing in the IGP order that tells anyone that Pierre Peterson ever existed. He's simply not mentioned. Now, the trustee does not seriously argue that Judge Pallmeyer erred in reviewing the record and determining that Peterson did nothing wrong that caused Emerald to lose the license. Instead, the trustee argues that the district court was not free to make this determination, that according to her reading of the IGP ruling, the IGP had already determined that Peterson had caused Emerald to lose the license, and Judge Pallmeyer engaged in impermissible second guessing of the IGP determination. Now, this argument is wholly without merit. It is based upon an entirely false premise. The IGP did not determine that Peterson had violated any IGP rule or that Peterson had caused the loss of the license. As noted, the IGP final order never mentioned Peterson at all, nor was his testimony sought by the IGP. What the IGP did say  which could justify, which are sufficient to justify, the revocation of license, not did cause it, but sufficient to justify, the district court took that language into account and reviewed it. And I think this highlights another problem with the trustee's argument. It's undisputed that Peterson was not party to the IGP proceedings. He was not named, he was not represented, he wasn't there, he had no role. Therefore, under normal principles of law, those proceedings cannot be used as dispositive against him in a way to proceed it. He is not bound by the litigation that he was not a party to. The trustee attempts to overcome this. I see I'm running short on time. It's in my brief. Let me address one last point. The court did below find that Peterson did violate Rule 235A. Okay. We don't think that's accurate. We don't think that's right. Rule 235A says that a ownership interest in an entity that holds an owner's license may only be transferred with leave of the IGB. The record is clear. Pierre Peterson transferred no interest without leave of the IGB. The district court did not say otherwise. Pierre Peterson did transfer some shares to Don Peterson, but as Ms. Deegee acknowledges, as the district court acknowledged, the IGB said that was fine. It made no finding against that. They did give approval. Whether they gave approval, they didn't find there was anything wrong with it. It's not part of the record yet. The transaction that caused this was the five insiders. Pierre Peterson was not one of those five insiders. The district court found that Mr. Peterson had quote-unquote arranged these transfers. In other words, he acted as a lawyer in these transfers. It's not sufficient to violate the rule. What he did was he had his people draft a purchase agreement that says these transfers are subject to approval of the IGB. So there's nothing Mr. Peterson did that violated this rule. The district court was right that he did nothing that caused the loss. The district court was wrong to say he violated the rule. Thank you very much. Thank you, counsel. Your Honor, Ms. Deegee made the point. No one could read the IGB order as based on disclosure violations, and we agree with that. The IGB order focused on mob connections, on concealment, on surreptitious transactions. The district court found most of that did not occur. Ms. Deegee emphasized that the IGB order uses the language Kevin Flynn flat-out lied. When the IGB order says that, it's referring to Emerald's agreement, supposed agreement, to relocate to Emerald, to Rosemont, with Duchessois, the Davis Companies, and Rosemont Mayor Don Stevens. The IGB says Kevin Flynn flat-out lied about Emerald's plans to move to Rosemont. That is incorrect. The district court found that could not be proved. The agreement to carve up the interest in Emerald in order to obtain relocation to Rosemont was not proved. Ms. Deegee says the district court didn't really find that. The district court found that there were meetings with Duchessois, there were meetings with the Davis Companies, and didn't really find the key findings of the IGB order unproved. That's incorrect. The Davis Agreement was central to the IGB order, and the district court here found that the Davis Agreement was not proved. So all that goes to say, it's true. The IGB order cannot be read as revoking the license based on disclosure violations, yet that is what the district court found occurred here. Your Honor, ask a question about active concealment versus negligent failures to disclose. That's exactly, that's a crucial distinction between the IGB order and what the IGB pointed to when it revoked the license, and the district court's findings about what these individual defendants actually engaged in. It's not clear to me why the state litigation, the IGB's findings and conclusions, and the license revocation decision was affirmed on appeal, there were some modifications to it, and the Illinois Appellate Court found that some of it wasn't justified, but once that state litigation concluded and found rules violations, it's not clear to me why those conclusions weren't preclusive on the federal litigation, but that wasn't appealed, I understand, so it's not really before us, but I don't understand why it wouldn't be preclusive. They weren't preclusive for several reasons. For one thing, of course, the individual defendants here were not parties to the IGB's regulatory proceeding or the appellate court's decision. They were not in privity. Kevin Flynn was not in privity with Emerald at the relevant time. He was not the CEO of Emerald during the regulatory proceedings. He was not the controlling shareholder of Emerald during the regulatory proceedings, so the only basis that's offered for using the IGB decision and the appellate court decision in a preclusive fashion against Kevin Flynn's privity is factually unsupported. Beyond that, there are major fairness concerns. Everybody else was in privity. I'm not sure about that, Your Honor. And he was acting effectively. Maybe the legal formalities weren't present. And now he was removed from employment as Emerald's CEO long before. In 2002, the IGB revocation proceedings were primarily in 2005. There was a brief window of IGB revocation proceedings earlier in 2002, but they were almost immediately terminated when the involuntary bankruptcy petition was filed. So he's formally separate by this time? Yes. Okay. Yes. Okay. Well, that explains it then. Yes. So, and beyond that, of course, the IGB did not find that Kevin Flynn breached a contract, that Kevin Flynn's breach caused any injury. Well, I understand. I'm talking about the rules violation. Okay. Once the rules violations are adjudicated conclusively in state court, they should have preclusive effect in federal court, assuming identity of the parties. But you're telling me that wasn't here and that's why it wasn't given preclusive effect. And, again, this wasn't appealed. To be fair, I believe it was appealed. But for the reasons we've just discussed, I believe the district court's ruling on that and the bankruptcy court's ruling on that was correct. Organized crime was a major factor in the IGB's order and the effect of organized crime in the order was not eliminated by the appellate court's ruling. The appellate court stated that its role in reviewing the IGB order here was to determine whether competent evidence existed to support the revocation. It said it did. When it talked about organized crime, it said this rule requires an unsavory reputation. The evidence you've relied on is confidential FBI memos, confidential memos. So the reputation matters more than the reality, right, under Illinois law on this? That's what the Illinois appellate court said. Correct. But as the district court found, having read all of this, organized crime was a primary motivation of the IGB order and factually unsupported in this case. So that's why this is crucial to the causation question. The IGB had a major focus on the active, its perception of active concealment, its perception of connections to organized crime, its perception of collusive schemes to deceive the IGB, playing fast and loose with the law, surreptitious transactions, et cetera, all of which the trustee failed to prove in this case. Because the trustee failed to prove those, there's nothing in the IGB order. The IGB order, what remains of it, is insufficient to establish causation, to establish that the rule violations that the district court found here caused the IGB decision. That sounds an awful lot like you want to argue with the revocation, right? I do not want to argue with the revocation. That's over and done with. You're asking would I reach the same conclusion if I were the IGB and this were happening again? No, but your argument about causation here seems to presume that the Illinois appellate court erred by affirming the revocation. Based on the factual record in this case, it does seem that the IGB erred in its reading of the facts and that the Illinois appellate court also made an error in assessing whether facts supported the IGB's ruling. But that's not our business, right? No. We do not and cannot and would not challenge whether Emerald's license was properly revoked. That's over and done with. But this is a separate case. This is a separate claim against individual defendants attempting to hold individuals liable for tens of millions of dollars based on their agreement to comply with regulation as shareholders. The trustee needed to prove every element of breach of causation for every defendant in this case, and she failed to do that. Joining several liability quickly, your honors. As your honors suggested, in SURE 1, the district court was not required to follow concurrent breach and on its face, the SURE 1 decision doesn't apply here. The district court's ruling on the statute of limitations for the fiduciary duty breach claim was also correct for the reasons stated in our brief. Thank you, your honors. Thank you. I don't think I used all my time, and I did want to just correct two points in the record. How much time? Mr. Peterson. One is this idea of did we raise the issue of issue preclusion, and we did. At page 101 of our brief, in connection with the ruling on Mr. Peterson, we indicated that we thought... Right, just on Mr. Peterson, not the other... No, but we also incorporated that same argument as an alternative basis to affirm the ruling against the defendants, and that's in the part of the brief discussing cause and effect with regard to the Flynn defendant. Okay. My eyes may have been glazing over at that point. And I understand you're a very, very lengthy brief. It's a huge pile of briefs. But we did raise that. The other point I wanted to correct was Mr. Lewis said that the IGB settled the violations involving the five insiders. They settled all the violations on a conditional basis, and the settlement fell apart. That part of the settlement fell apart, and they went ahead and then found that that was a rule violation. So that was tentatively settled like everything was, but the settlement became a nullity when they breached the condition. Ms. Flint, do we have any response to her since I let her come back? Thanks to all counsel. The case will be taken under advisement.